**JOHN HANCOCK MUTUAL LIFE INS. CO., Plaintiff,**

v.

**AMERFORD INTERNATIONAL CORP., Defendant.**

**No. 91 Civ. 8635 (JFK).**

United States District Court,
S.D. New York.

Sept. 28, 1993.

Townley & Updike, New York City (Barbara Roth, Mary Elizabeth Mahon, of counsel), for plaintiff.

Martin H. Scher, Carle Place, NY (Robert S. Nayberg, of counsel), for defendant.

## OPINION AND ORDER

KEENAN, District Judge:

Plaintiff has moved and Defendant cross-moved for summary judgment. For the reasons set forth below, Plaintiff's motion is granted and Defendant's cross-motion is denied.

### BACKGROUND

In 1985, Plaintiff John Hancock Mutual Life Insurance Co. ("Hancock") and Defendant Amerford International Corp. ("Amerford") entered into a Planned Funding Agreement ("PFA") under which Hancock administered Amerford's employee benefits and paid claims from Amerford's funds. The PFA became effective on July 1, 1985 and was to continue for successive one-year periods until terminated. *See* Affidavit of Mary

E. Mahon in Support of Plaintiff's Motion ("Mahon Aff.") at ¶ 2 & Exhibit A (a copy of the PFA). The PFA was essentially an insurance policy guaranteeing that Amerford's liability for its employees' medical benefits would be capped at a predetermined amount each year. Thus, the PFA provided for a "claim liability limit" ("CLL"), a figure representing the maximum amount of Amerford's liability in a given contract month or year. *See* Exhibit A to Mahon Aff., Section 4(k), (1) (defining "Claim Liability Limit" for Contract Year and Contract Month respectively, and providing formulae to determine CLL for given contract year or month).

Any amount that Hancock paid out beyond the CLL was deemed "Deficit," and the PFA required Hancock to reimburse Amerford for the Deficit. *See* Exhibit A to Mahon Aff., Section 4(o) (defining Deficit). Conversely, if the amount of claims paid out in any future month or year was less than the CLL, then "Margin" existed and Amerford was obligated to pay Hancock as additional premium any amounts over the CLL previously paid out (Deficit) plus expenses to the extent such amounts and expenses exceeded premium paid. *See id.* Section 4(n) (defining Margin). Thus, the PFA assured Amerford that Hancock would make all necessary payouts above the CLL, and that Amerford would not have to repay Hancock until Margin became available.

Amerford renewed the PFA each year from 1985 through 1990, with each new contract year beginning on July 1 ("Policy Anniversary"). *See id.* Section 4(i) (defining "Contract Year"). The last Contract Year, which the PFA defines as beginning on a Policy Anniversary and ending on the date the PFA is terminated, *see id.* at Section 4(i)(2), began on July 1, 1990 and ended on September 30, 1990, when Amerford terminated the Agreement.

Hancock contends that on the date of termination, it became entitled to collect as additional premium the lesser of the Margin for the last Contract Year or the total amount of Deficit that had not been previously recovered plus its expenses for the last Contract Year less any amounts due to Amerford. In mid-December 1990, Hancock sent Amerford a report setting forth the amount it owed Hancock under the relevant terms of the PFA for services during the last Contract Year: $101,028.00. *See* Mahon Aff. ¶¶ 15–26. Amerford refused to pay, claiming that the PFA requires no such payments. This lawsuit followed.

## DISCUSSION

█ Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted if "there is no genuine issue as to any material fact and [ ] the moving party is entitled to judgment as a matter of law." It is axiomatic that the role of the court on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986).

█ The movant bears the initial burden of informing the court of the basis for its motion and identifying those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). If the movant carries its initial burden, the party opposing the motion must then demonstrate a genuine dispute as to the material facts. *See id.* at 322, 106 S.Ct. at 2552; *see also Greater Buffalo Press, Inc. v. Federal Reserve Bank,* 866 F.2d 38, 42 (2d Cir.), *cert. denied,* 490 U.S. 1107, 109 S.Ct. 3159, 104 L.Ed.2d 1022 (1989). The opposing party may not simply rely on its pleadings or on conclusory factual allegations. *See Gray v. Darien,* 927 F.2d 69, 74 (2d Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 170, 116 L.Ed.2d 133 (1991). Rather, the opposing party must present specific evidence in support of its contention that there is a genuine dispute as to the material facts. *See Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. at 2553. To demonstrate a "genuine dispute," the opposing party must come forward with enough evidence to justify a reasonable jury in returning a verdict in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106

S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986).

■ In contract actions, "summary judgment is appropriate when the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning." *United States v. 0.35 of Acre of Land,* 706 F.Supp. 1064, 1070 (S.D.N.Y.1988). A court may not draw any inference or give any construction to the terms of a written contract that "may be in conflict with the clearly expressed language of the written agreement." *Id.*

■ In this case, the Court finds the language of the PFA unambiguous. Section 9 II of the Agreement provides that

> [u]nder the provisions of a Policy which permit [Hancock] to receive additional premium payments, [Amerford] agrees to make additional premium payments to [Hancock] as specified below:
>
> (b) [a]t the end of each Contract Year, an amount equal to the lesser of: (i) the Margin for such Contract Year; or (ii) the total amount of the Deficit, if any, which has not previously been recovered through the payment of additional premiums.

Mahon Aff., Exhibit A., Section 9 II. This section provides unambiguously that Hancock is entitled to receive the lesser of the Margin or Deficit in any Contract Year. As defined in Section 4(i), the last Contract Year runs from a Policy Anniversary to the date the Agreement is terminated. Thus, the last Contract Year in this case ran from July 1, 1990 to September 30, 1990. On September 30, 1990, the end of the Contract Year, Hancock became entitled to the lesser of the Margin or the Deficit for that three-month Contract Year.

Notwithstanding the clarity of the Agreement's language, Defendant argues that the PFA is "ambiguous, if not incomprehensible." Defendant's Memorandum of Law in Opposition to Plaintiff's Motion and In Support of its Cross–Motion ("Def.Mem.") at 2. Defendant does not argue that any individual section is unclear. Rather, Amerford contends that Section 9 II(b) cannot be reconciled with Sections 5, 7 and 10, the PFA's termination provisions, and that the entire Agreement is therefore ambiguous. This argument is unpersuasive. Sections 5, 7 and 10 certainly delineate the rights and obligations of the parties upon the Agreement's termination, but those provisions neither contradict nor preempt the terms of Section 9 II(b). As Plaintiff correctly asserts, Sections 5, 7 and 10 specify the procedures through which the PFA may be terminated and manner in which employee medical claims pending at the time of termination are to be resolved. Defendant's argument that these sections, which do not delineate Amerford's responsibility for accrued Deficit, must preempt the section that does define that obligation, is nonsensical. Taken to its logical extreme, this position would mean that any contractual provision that did not deal with a given issue must preempt the provision that did cover that issue.

■ Essentially, Amerford asks this Court to imply a term into the Agreement that is not there: namely, that sections 5, 7 and 10 are the only provisions that are effective upon the Agreement's termination. The Court may not, however, rewrite the terms of the Agreement. *See Shames v. Abel,* 141 A.D.2d 531, 533–34, 529 N.Y.S.2d 344, 347 (2d Dep't 1988) ("courts enforce rather than rewrite contracts and ... they may not by construction add or excise terms nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing"). Even if such rewriting were permitted, however, there would be no need for it. The Agreement, which is thirteen single-spaced pages, is comprehensive and clear. Nothing in the contract suggests that Section 9 II(b) becomes inoperative on the Agreement's termination, which is essentially what Defendant argues, and there is nothing to suggest that that is what the parties intended.[1] Further,

---

1. As Plaintiff persuasively argues, "Amerford's argument is further undercut by its concession that it is responsible for the Administrative Service Charges provided for in Section 9 of the PFA for the Last Contract Year. Amerford cannot admit its responsibility for these charges and at

giving effect to Section 9 II(b) accords with the principles of contract interpretation. *Rentways, Inc. v. O'Neill Milk & Cream Co.,* 308 N.Y. 342, 347, 126 N.E.2d 271, 273 (1955) (that "interpretation is favored which will make every part of the contract effective").[2]

■ Having determined that Hancock is entitled to collect the back Deficit that was available when the PFA was terminated in September 1990, the Court now turns to how the CLL and Margin for the last Contract Year are calculated. Section 4(k) of the Agreement contains the formula for computing the CLL at any time during a Contract Year. The formula contains three variables: (1) the Monthly Dollar Factor, which both sides agree was $520.21, (2) the number of months remaining until the "next scheduled Policy Anniversary" and (3) the number of covered employees. Amerford disputes the numbers that Hancock has assigned to the latter two variables.

Amerford argues that as to the second factor, there could be no "next scheduled Policy Anniversary" because the Agreement was terminated. Therefore, it asserts, the only months that count in calculating the CLL are those in which the PFA was actually in effect during that Contract Year: namely, three. The Court disagrees. Section 4(k) refers explicitly to the next *scheduled* Policy Anniversary, not the next *actual* Policy Anniversary. The Court declines to accept Defendant's contorted interpretation of Section 9's plain and precise language. *Harris Trust and Savings Bank v. John Hancock Mutual Life Insurance Co.,* 767 F.Supp. 1269, 1273 (S.D.N.Y.1991), *aff'd,* 970 F.2d 1138 (2d Cir. 1992) ("[i]f the language of a contract is otherwise plain, the parties cannot create a genuine issue of fact by simply urging different interpretations"). Accordingly, when

Amerford terminated the Agreement in September 1990, the next scheduled Policy Anniversary was July 1, 1991, regardless of whether the PFA was then in effect. Thus, as of the termination date of September 30, 1990, the number of months remaining until the next scheduled Policy Anniversary was nine, not three.

As to the third factor, Amerford disputes Hancock's computation of the number of covered employees. Sections 4(k)(1)(A) and 4(k)(2)(i) provide for the use of a representative number in calculating the CLL for the current Contract Month, which in turn is used to estimate the CLL for an entire Contract Year. As the number of covered employees changed throughout that Contract Year, Hancock used the same formula to adjust its CLL estimate. Through the same formula, Hancock was able to estimate the CLL for the last Contract Year, from which it in turn computed the amount Amerford owed. Thus, the Court finds that Hancock correctly used the formula established in the PFA for estimating the CLL for the last Contract Year. Amerford's arguments to the contrary are meritless.[3]

Finally, Defendant's suggestion that Hancock did not give it the opportunity to terminate the PFA before the new monthly Dollar Factor went into effect, *see* Nayberg Aff. at ¶¶ 44–47, is not grounds for denying summary judgment to Hancock. Defendant's attributions of motive to Hancock are unsupported, and do not relieve Defendant of its obligations under the Agreement. *See New Bank of New England, N.A. v. Toronto–Dominion Bank,* 768 F.Supp. 1017, 1022 (S.D.N.Y.1991) (a court should not "read an ambiguity into an agreement merely because one of the parties becomes dissatisfied with its position under the plain terms of the

the same time argue that it is not responsible for any other amounts due John Hancock for that same period of time." Plaintiff's Reply Memorandum ("Pl. Reply") at 6, n. 4 (citations omitted).

2. Having found that the contract is unambiguous, the Court need not, and indeed may not, refer to parol evidence, as Defendant urges it to do. The Agreement's merger clause would appear to preclude parol evidence in any event.

3. Amerford makes a conclusory assertion that the variable for the number of covered employees is "approximately 125." *See* Affidavit of Andrew Titley in Opposition to Plaintiff's Motion ("Titley Aff.) ¶ 39; Affirmation of Robert S. Nayberg in Opposition to Plaintiff's Motion and In Support of Defendant's Cross–Motion ("Nayberg Aff.") ¶ 43. It offers no explanation of how it arrived at this figure, nor does it explain how an "approximate" number is used in the precise formula given in the PFA.

None.

None.

None.

None.

None.

## 1112

agreement"); *Libra Bank, Ltd. v. Banco Nacional de Costa Rica, S.A.,* 570 F.Supp. 870, 893 (S.D.N.Y.1983) ("where there is no inherent ambiguity, courts should not, under the guise of judicial construction, reach an artificial interpretation in order to relieve a party from an improvident bargain").

Plaintiff's application for Rule 11 sanctions is denied.

### CONCLUSION

Plaintiff's motion for summary judgment is granted in the amount of $101,028.00 plus interest from October 1, 1990. Defendant's cross-motion for summary judgment is denied, as is Plaintiff's application for Rule 11 sanctions.

**SO ORDERED.**